## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| TYRONE ANTHONY HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV424-036 |
| | ) | |
| JOHN FLORIO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

*Pro se* plaintiff Tyrone Anthony Hill filed a 42 U.S.C. § 1983 Complaint alleging that he was subjected to excessive force during the course of an arrest and that officers fabricated testimony to enhance the charges against him. *See* doc. 1 at 8-11. The Court screened his Complaint, authorized service of the excessive force claims against Defendants John Florio ("J. Florio"), Carlos Escobedo, Lacy Florio ("L. Florio"), and Jeremy Salerno, and dismissed the remaining claims. *See generally* doc. 10. Defendants appeared and moved to dismiss. Doc. 16. Plaintiff responded in opposition. Doc. 21. Defendants replied. Doc. 23. The Motion to Dismiss is, therefore, ripe for review. For the reasons explained below, the Motion is **GRANTED**. Doc. 16.

In considering a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept[ ] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009) (citation omitted). However, unlike factual allegations, conclusions in a pleading "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). On the contrary, legal conclusions "must be supported by factual allegations." *Id.* Indeed, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Airlines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

Hill's Complaint alleges that he was subjected to excessive force during the course of his arrest and transportation to detention on August 8, 2023. *See, e.g.,* doc. 1 at 8-11. The Court previously noted that the allegations themselves indicated that, perhaps, the force alleged was not excessive. *See* doc. 10 at 3. In their Motion to Dismiss, defendants divide Hill's allegations into three separate "incidents." *See* doc. 16 at 2-6. Hill

does not dispute defendants' interpretation of his claims. *See generally* doc. 21. The Court will, therefore, follow the division into "incidents" in discussing the merits of the Motion. Before considering the substantive arguments, however, the Court must determine whether officers' body-worn camera recordings, submitted by defendants, *see, e.g.,* doc. 18, may be considered in evaluating their Motion to Dismiss.

As the Eleventh Circuit has explained, "[i]n general, district courts must limit their consideration to the pleadings and any exhibits attached to the pleadings when ruling on a motion to dismiss." *Swinford v. Santos*, 121 F.4th 179, 186-87 (11th Cir. 2024) (citation omitted). However, materials "incorporated by reference" to the complaint may be considered, without converting the motion to dismiss into a motion for summary judgment. *Id.* Such materials may be considered if they are "(1) central to the plaintiff's claim; and (2) undisputed, meaning that [their] authenticity is not challenged." *Id.* (quoting *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024)). In this Circuit the incorporation-by-reference doctrine applies to police officers' body-worn-camera video of relevant events, even if they are not explicitly

incorporated. *Id.* (citing *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1277-78 (11th Cir. 2023)).

Hill addresses the videos but does not raise any substantial challenge to their authenticity. First, he questions whether he explicitly incorporated the videos into his Complaint but protests he does not have access to confirm any reference. *See* doc. 21 at 2-3. Although the Court cannot discern any explicit reference to the officers' recordings in the Complaint, the Eleventh Circuit has made it clear that such explicit reference is not necessary. *See Johnson*, 107 F.4th at 1300 ("[W]hen resolving a motion to dismiss . . . , a court may properly consider a document *not referred to or attached to a complaint* under the incorporation-by-reference doctrine . . . ." (emphasis added)). To the extent that Hill does not concede the recordings' authenticity, as Defendants point out, he does not identify any fact impugning it. *See* doc. 23 at 2-3; doc. 21 at 4-9. As the court explained in *Swinford*, a plaintiff need not affirmatively "stipulate that a video is authentic." 121 F.4th at 187-88. Moreover, like the video recordings in *Swinford*, the videos attached to Defendant's Motion, "[w]hile [they] may be 'incomplete' in the sense that they do not show every angle [of the events at issue], they

4

clearly show unedited footage of the event underlying [plaintiff's] excessive force claim." *Id.* The recordings are, therefore, properly considered in evaluating the Motion to Dismiss.

Defendants move to dismiss based on their entitlement to "qualified immunity." *See, e.g.,* doc. 16 at 8. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The doctrine is "intended to 'allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including

discovery.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Lambert v. Fulton Cnty.*, 253 F.3d 588, 596 (11th Cir. 2001)). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

To rely upon qualified immunity, a defendant must first show that he acted within his discretionary authority. *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, a defendant must show that he "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). If a defendant shows that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity," by showing both that the defendant violated a constitutional right and that the violation was clearly established. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).

Defendants' showing that their conduct during all of the relevant periods was within their respective discretionary authorities is limited, at best. Defendants' Motion, while it acknowledges the threshold requirement, only addresses it in the most cursory fashion. *See* doc. 16 at 8. The extent of their argument is the accurate observation that "[m]aking arrests is within the official responsibilities of police officers." *Id.* (citing *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004)). However, it is not entirely clear that all of the officers were "making [an] arrest[ ]" during the entirety of the relevant events. Defendants' reply brief points out that Plaintiff has not challenged their assertion that all of the acts complained of were within their respective discretionary authorities. *See* doc. 23 at 4.

As discussed below, there is some ambiguity concerning the scope of the arrest and detention in this case. *Cf. Crocker v. Beatty*, 995 F.3d 1232, 1253-54 (11th Cir. 2021) (Newsom, J. concurring) (noting that "[t]he main opinion finds it unnecessary to decide whether . . . one who has been arrested but has not yet been taken before a magistrate for a probable-cause determination," is either an arrestee or a pretrial detainee). The Court is, therefore, loath to conclude that Defendants

7

have all borne their burden by simply asserting, without any further
discussion, that arrests are within the general discretionary authority of
law enforcement officers.  However, even though Defendants do not point
it out, transporting a suspect to jail is also within officers' discretionary
authority.  *See, e.g., Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.
2002), *overruled on other grounds by Pearson*, 555 U.S. 223 (finding
officer's discretionary authority "clear . . . when he . . . transported
[Plaintiff] to jail."); *Davis v. Lowers*, 132 F. App'x 302, 304 (11th Cir.
2005) ("Here, no one disputes that Defendants were acting within the
scope of their discretionary authority by arresting [Plaintiff] and
transporting him to the jail.").  Moreover, as discussed below, the Court
finds that the video recordings show that no constitutional violations
occurred, under either the Fourth or Fourteenth Amendment standard.
Thus, even if the Defendants were not entitled to qualified immunity
against Plaintiff's claims, they would still be entitled to dismissal for his
failure to state any claim upon which relief may be granted.[1]  Under the

---

[1] Defendants' assertion that Plaintiff's claims should be dismissed for failure to state
a claim, as distinct from their assertion of qualified immunity is ambiguous.  Their
Motion invokes Rule 12(b)(6), which implies that they assert the Complaint fails to
state a claim.  *See* doc. 16 at 1.  As this Court has explained "the qualified immunity
inquiry and the Rule 12(b)(6) standard become intertwined."  *A.K.J. v. Roundtree*,
2025 WL 462514, at *3 (S.D. Ga. Feb. 11, 2025) (internal quotations and citation

circumstances, and given Plaintiff's nonopposition, the Court will assume, without deciding, that Defendants have borne their threshold burden. *Cf. Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021) ("It is undisputed that [the defendants] were acting within the scope of their discretionary authority."); *Davis,* 132 F. App'x at 304-05; *Clay v. Banks*, 2021 WL 5240839, at *4 (S.D. Ga. Aug. 6, 2021) ("Where it is undisputed the [defendant] was acting within her or his discretionary authority, it falls to the plaintiff to 'show that qualified immunity should not apply.'" (quoting *Crocker*, 995 F.3d at 1239-40), *adopted* 2021 WL 4130522 (S.D. Ga. Sept. 10, 2021).

Given the assumption that the Defendants were acting within the scope of their discretionary authority during all of the events relevant to Plaintiff's claims, the Court proceeds to consider whether Plaintiff has alleged or shown that a constitutional right has been violated and whether the right at issue was "clearly established" at the time of the

---

omitted).    "Thus, if a defendant asserts a qualified immunity defense in a Rule 12(b)(6) motion to dismiss, the Court should grant qualified immunity if the plaintiff's complaint fails to allege a violation of a clearly established constitutional or statutory right."  *Id.* (quoting *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007)) (internal quotation marks and alteration omitted).  Any defect in the Defendants' showing regarding their discretionary authority is, therefore, harmless.

alleged misconduct.  *See, e.g., Pearson*, 555 U.S. at 232.  The Supreme Court has clarified that courts have discretion to consider whether a constitutional violation occurred and whether the right was clearly established in either order, *see, e.g., Pearson*, 555 U.S. at 236, and "[t]he absence of a constitutional violation ends the analysis of qualified immunity," *Land v. Sheriff of Jackson Cnty. Fla.*, 85 F.4th 1121, 1126 (11th Cir. 2023) (citing *Pearson*, 555 U.S. at 242); *Davis*, 132 F. App'x at 304 ("The threshold inquiry [for qualified immunity] is whether [Plaintiff's] allegations, if true, establish a constitutional violation.").  As explained below, the Court finds that the videos establish that no constitutional violation occurred.   Since the Court finds that no constitutional violation occurred, any claim that any Defendant failed to intervene must also fail.  *See Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023) ("Of course, a failure-to-intervene claim requires an underlying constitutional violation.  An officer cannot be held liable for filing to stop or intervene when there was no constitutional violation

being committed." (internal quotation marks, alteration, and citation omitted)).

The Fourth Amendment "encompasses the right to be free from excessive force during the course of a criminal apprehension. [Cit.] To establish a Fourth Amendment claim for excessive force, a plaintiff must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019) (internal quotation marks and citations omitted). "Under the Fourth Amendment, [courts] evaluate whether force is excessive by applying an objective reasonableness standard. [Cit.] That is, [they] ask whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Brooks v. Miller*, 78 F. 4th 1267, 1282 (11th Cir. 2023) (internal quotation marks and citations omitted).

"Determining whether the force used to effectuate a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). "In determining the reasonableness of the force

applied, [courts] look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate[,]" keeping in mind "that officers make split-second decisions in tough and tense situations." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (internal quotation marks and citations omitted).

Evaluating whether use of force violates the Fourth Amendment involves two steps. *Charles*, 18 F.4th at 699. First, the Court must determine whether the type of force used is categorically unconstitutional. *Id.* At the second step, if the force is not categorically unconstitutional, the Court evaluates whether it was excessive, applying the factor-test established in *Graham*. *Id.* Among the specific factors courts consider are "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted). If force is necessary, courts also consider whether the amount of force used was reasonable, considering "(1) the need for the application of force, (2) the relationship between the need and amount of

force used, and (3) the extent of the injury inflicted." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017).

"Incident 1," as identified in Defendants' Motion, includes the events beginning with Defendants J. Florio and Escobedo's initial contact with Hill until Hill is finally subdued. *See* doc. 16 at 1-2. The Complaint alleges that those Defendants "quickly approached [Hill] without [his] noticing," "grabbed" his hands and arms, "snatch[ed] them behind [his] back," placed him in handcuffs that were excessively tight, and directed him toward a patrol vehicle by "shoving [him] and slangging [sic] [him] . . . ." Doc. 1 at 8. Allegedly in response to the forceful treatment, Hill "took off running," jumped over a fence, and fell. *Id.* Although not included in the Complaint, Hill's response to the Motion to Dismiss contends that "the officers [sic] applied pressure point technique to neck and wrist," and he fled "after [his] complaints was [sic] ignored." Doc. 21 at 12. The Complaint alleges that, after he fled, officers followed Hill over the fence, tackled him, and restrained him on the ground until other officers arrived. Doc. 1 at 8.

Review of the relevant body-worn camera video belies Hill's allegations. The video captured by Defendant J. Florio's body-worn

camera[2] shows that officers did not approach Hill surreptitiously.  Two marked vehicles parked on either side of the car in which Hill was sitting with the driver's door open.  He appears to look directly at Escobedo as J. Florio approaches.  Defendant J. Florio instructs Hill to step out of the vehicle, and Hill turns to look at him, before J. Florio arrives at the vehicle.  J. Florio does not "grab" Hill's hands or arms; he instructs Hill to raise his hands and turn around.  Hill complies.  Although J. Florio does grasp Hill's wrist, it is clear that Hill himself puts his hands behind his back.  While it is impossible to discern how tight the handcuffs are from the video, it is clear that Hill does not complain about them or ask that they be loosened.  Instead, he asks, relatively calmly, "What did I do?"  Officer Escobedo explains the reasons for Hill's arrest and, with one hand gripping Hill's upper arm, walks him first toward one, then toward the other vehicle.  It is clear from the video recorded by Defendant Escobedo's body-worn camera[3] that there is no "shoving."  Hill does not

---

[2] The described footage is captured on the video labeled "J. Florio Body Cam (Exhibit 1)".

[3] The described footage is captured on the video labeled "Escobedo Body Cam (Exhibit 2).

object to the treatment at all until he breaks Escobedo's—apparently loose—grip on his arm and flees headlong.

It is clear that, at least until Hill flees, neither Defendant J. Florio nor Escobedo subjected him to excessive force. Up to the point when Hill flees, the video does not indicate that either officer did anything more than touch Hill incidentally in the course of effecting his arrest, apparently on a warrant. There is no question that physical contact is not categorically unconstitutional force, in the context of effecting a lawful arrest. *See, e.g., Sevostiyanova v. Cobb Cnty. of Ga.*, 484 F. App'x 355, 359 (11th Cir. 2012) ("The right to make an arrest carries with it the right to use some degree of physical force . . . , and the typical arrest involves some force." (citing *Lee*, 284 F.3d at 1200)). "During an arrest, the application of de minimis force, without more, will not support a claim of excessive force in violation of the Fourth Amendment." *Charles v. Chambers*, 2024 WL 4266842, at *4 (11th Cir. Sept. 23, 2024) (internal quotation marks and citation omitted). The recordings by Defendants J.

Florio and Escobedos' body-worn cameras show that the force used, prior to Hill's flight, was no more than *de minimis*.

The events subsumed in what Defendants call "Incident 1," also include a period after Hill flees and before he is finally subdued and escorted to a patrol car. *See* doc. 16 at 2. Defendants acknowledge that they "held Plaintiff to the ground," and that Plaintiff "complained that he could not breathe." *Id.* Hill's Complaint does not clearly allege any claim arising from those events. *See* doc. 1 at 7. His only description states: "Ofc. J. Florio came over the fence first and laid on me using his body weight to hold me down. Ofc. Escobedo came over the fence next and he to[o] used his weight to assist in holding me down." *Id.* at 8. There is no question that physically subduing a suspect is not categorically unconstitutional. *See, e.g., Clinch v. Chambers*, 2024 WL 644567, at *10 (S.D. Ga. Feb. 15, 2024) (citing, *inter alia*, *Charles*, 18 F.4th at 699, 701) (explaining that "[t]ackling an arrestee is not categorically unconstitutional").

The Court's analysis of the force used by J. Florio and Escobedo is complicated by the fact that both officers' body-worn cameras were dislodged as they surmounted the fence. There is, therefore, no video

recording of the officers' interactions with Hill until Defendant Salerno

arrives and his body-worn camera captures the events.[4]   Despite the

absence of any video recording, dismissal of any claims arising from that

portion of "Incident 1" that occurred when Hill was subdued after his

flight remains appropriate.   Hill's allegations, even as supplemented in

his response to the Motion to Dismiss, indicates that the only force either

Defendant used was the force necessary to restrain him while they waited

for other officers to arrive.   The Court, therefore, concludes that,

notwithstanding the gap in the video, Hill has simply not alleged that he

was subjected to any objectively unreasonable force during the

unrecorded period.

Once Hill has been fully subdued, it is not entirely clear that the

Fourth Amendment continues to apply.   Judge Newsom observed,

concurring in *Crocker*, that the Eleventh Circuit has not conclusively

---

[4] Defendant J. Florio's body-worn camera is dislodged at 19:15:27. *See* Ex. 1. Only grass is visible until he retrieves it at 19:24:36. *Id.* Defendant Escobedo's body-worn camera is dislodged at 19:15:31. *See* Ex. 2. Again, only grass is visible until he retrieves it at 19:24:58. *Id.* Defendant Salerno's body-worn camera first records Hill and Defendants J. Florio and Escobedo at 19:18:39. *See* Ex. 3 ("J. Salerno Body Cam Footage). There are, therefore, approximately three minutes of time that are not recorded by any defendant's body-worn camera. Because the events are captured by multiple defendants' body-worn cameras, the Court cites to the internal timestamp, visible in the upper right-hand corner of all the videos.

determined whether "one who has been arrested but has not yet been taken before a magistrate for a probable cause determination . . . is (1) an *arrestee* whose excessive-force claim should be analyzed under the Fourth Amendment or instead (2) a *pretrial detainee* whose excessive-force claim should be analyzed under the Fourteenth Amendment." *Crocker*, 995 F.3d at 1253 (Newsom, J. concurring).  Other courts have approved, at least passively, treating excessive-force claims that arise while officers are "transporting [individuals] to the police station and then to a jail cell," as arising under the Fourth Amendment.  *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 71 (11th Cir. 2016).   The ambivalent treatment is harmless, Judge Newsom explains, *see Crocker*, 995 F.3d at 1256 n. 3, because "inasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Piazza v. Jefferson Cnty. Ala.*, 923 F.3d 947, 952-53 (11th Cir. 2019); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)

(holding that "a pretrial detainee must show . . . that the force purposely or knowingly used against him was objectively unreasonable.").

The Supreme Court has explained that, in analyzing excessive-force claims under the Fourteenth Amendment, courts must analyze objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397 (citation omitted). The Court also identified several "illustrative" and non-exclusive factors, including: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*; *see also Ireland v. Prummell*, 53 F.4th 1274, 1297 (11th Cir. 2022). The similarity of the *Kingsley* factors and the *Graham* factors is clear.

"Incident 2," as identified by Defendants, includes the events commencing when Hill is taken to a police vehicle and includes officers' attempts to secure him in the back of the vehicle and concluding after he is taken to a hospital and cleared to be taken to jail. *See* doc. 16 at 2-5.

19

The events of "Incident 2" are, first, captured on Defendant Salerno's body-worn camera.[5] Defendants J. Florio, Escobedo, and an unidentified female officer are seen restraining Hill, as he apparently tries to resist being escorted toward the car. *See* Ex. 3 at 19:18:56. Hill and the officers are off-camera for a brief period when Salerno turns to open the door of his car. *Id.* at 19:19:00-19:19:06. Hill is held against the car and the female officer performs a brief pat-down. *Id.* at 19:19:09-19:19:58. Defendant Salerno then takes over the search. *Id.* at 19:19:59-19:21:07. During the search, the video shows Hill moving and refusing to comply with J. Florio's commands to "stop" and "stay still." Defendants J. Florio, Escobedo, and Salerno proceed to attempt to place Hill in the back of the car.

The attempt to place Hill in the car begins when one of the officers, it is not clear which, instructs him to "get in the car." Ex. 3 at 19:21:06. As the three officers attempt to guide Hill into the back of the car, the video shows him lifting his feet and bracing them against the car. *Id.* at 19:21:11. They lift him off the ground and attempt to guide his feet into

---

[5] As indicated above, Salerno's camera captured Defendants J. Florio and Escobedo as they walk a handcuffed Hill toward his vehicle. *See* Ex. 3 ("Salerno Body Cam") at 19:18:39.

the car. Again, the video shows Hill resisting being placed in the car by kicking and bracing his feet against it. *Id.* at 19:21:19. Salerno goes around the car and tries to pull Hill by his arm and shoulders. *See id.* at 19:21:46. Another officer takes Salerno's place. *Id.* at 19:21:56. When Salerno returns to stand behind J. Florio, Hill can be seen attempting to kick J. Florio. *Id.* at 19:22:02. J. Florio is then able to push Hill's feet into the car and shut the door. *Id.* at 19:22:06. Salerno then returns to the other side of the car, where Hill's head is. An officer, who appears to be Defendant Escobedo*,* is visibly struggling with Hill. *See id.* at 19:22:10. Hill appears to use the officers for leverage and stands, trying to push his way out of the car. *Id.* at 19:22:15. Throughout the attempts to secure Hill in the car, an officer can be heard warning him that, if he does not comply, he will be tased.

Once Hill has pushed himself out of the car, using his legs, Defendants J. Florio and Escobedo support his upper body while Hill continues to push against them. *See* Ex. 3 at 19:22:16. Escobedo appears to lose his grip as Hill struggles and Hill falls to the ground, striking his

21

head.[6]  *Id.* at 19:22:19.  Although Hill appears dazed, he immediately resumes bracing and pushing his feet against the car to resist being secured in it.  *Id.* at 19:22:27.  Salerno, again, goes back to the other side of the vehicle, where Hill's feet can be seen.  *Id.* at 19:22:51.  J. Florio can be seen struggling with Hill and Hill's feet continue to kick at the officers. *Id.* at 19:23:03.  J. Florio can be heard instructing Hill to "stop reaching for my weapon."  *Id.* at 19:23:01-19:23:02.  When J. Florio steps back, Hill attempts to fling his upper body out of the car, and officers attempt to shut the door.  *Id.* at 19:23:08.  Hill can be seen pushing against the door with his head, while J. Florio can be heard instructing the other officers to "watch his head."  *Id.* at 19:23:11.  The officers then manage to secure the door.  Defendant Solereno then drives away from the scene with Hill secured in the back seat.  *See id.* at 19:23:37.  Hill can be heard complaining of an injury to his "ear drum" and kicking the door of the car.

After waiting in the parked but running car, Salerno drives Hill to a hospital and parks.  *See* Ex. 3 at 19:30:00-19:37:19.  Hill remains in the

---

[6]  The video clearly contradicts Hill's assertion, in his response to the Defendants' Motion, that he did not fall.  *See* doc. 21 at 6.

car while officers wait for him to be seen by hospital staff and no officers interact with Hill until they remove him from the car to enter the hospital. *Id.* at 19:37:59-19:52:09.[7]  Officers remove Hill from the vehicle without incident. Ex. 1 at 20:06:24-20:06:52.  The recording shows that Hill is bleeding, apparently from his ear, though no wound is visible, and he states that he is unable to hear. *Id.* at 20:07:21.  A member of hospital staff attempts to clean a wound on Hill's ear, but Hill refuses any treatment.[8]  *See* Ex. 1 at 20:28:30-20:28:57.  During the period at the hospital, it does not appear that Hill complains to any medical personnel about his injuries.  Officers wheel Hill out of the hospital on a gurney and take him to a van for transport to jail. *See id.* at 20:46:50.

The video recording shows that Hill was not subjected to excessive force during the events included in "Incident 2."  First, the recordings show that, during the entire period, Hill was actively resisting arrest and refusing to comply with officers' commands.  To the extent that Hill

---

[7]  Defendant Salerno's video concludes, but Defendant J. Florio's body-worn camera captures the events continuously. *See* Ex. 1 at 19:52:09.

[8]  Hill's Complaint suggests that he did not refuse treatment and that officers prevented a full medical examination. *See* doc. 1 at 10 ("The doctor then checked my ear[,] I moved away from him a little because it was painful.  One Ofc stated that they will just take me since [I']m refusing, and the doctor allowed this.").  However, the video clearly records Hill stating "Don't touch me," when the nurse or doctor attempts to examine his ear. *See* Ex. 1 20:28:45.

alleges that Defendant J. Florio "choke slamm[ed him] into the back seat of the patrol vehicle . . . [and] struck [Hill] 3 times in the head," doc. 1 at 10, the video shows that allegation is false.  While there is no video recording from the inside of the vehicle, it is clear that Defendant J. Florio, physically, could not have "slammed" Hill or struck him with a baton in the confines of the back seat of the vehicle and during the brief duration when those events could have occurred.  The recordings do support the inference that J. Florio "punched" Hill during the altercation in the backseat.[9]

As Defendants argue, the video shows that Hill's active resistance was sufficient to render the force used objectively reasonable.  *See* doc. 16 at 11-12.  In strikingly similar circumstances the United States District Court for the Middle District of Georgia held that a suspect's resistance to being placed in the back of a patrol car justified multiple uses of a taser, in addition to direct physical force.  *See Lee v. Gee*, 722 F. Supp. 3d 1372, 1380-81 (M.D. Ga. 2024).  Hill's resistance here is virtually identical to the Plaintiff in *Lee*.  *See id.* at 1380 (noting that "Plaintiff

---

[9]  In the video recording, Defendant J. Florio states that he "punched [Hill]," while he appears to be preparing a written report.  *See* Ex. 1 at 19:52:27.

resisted by hooking his legs under the door of the vehicle, kicking at the officer behind him, squirming out of the vehicle on the opposite side and falling on his face, attempting to force his way out of the vehicle . . . , and pushing against the door with his legs as officers tried to close it."). *Lee* also noted that one of the officers "punched" the plaintiff "in the face several times during the struggle in the back of the patrol car." *Id.* Finally, *Lee* noted that the only discernable injuries resulting from the altercation were "lacerations." *Id.* at 1381. The video recordings here show no discernable injuries and the only evidence that Hill was injured at all is the minor bleeding visible at the hospital and Hill refused any medical attention for that injury.[10] This Court, therefore, like the court in *Lee*, concludes that "[i]n the totality of the circumstances, the . . . use of force was reasonable and proportional," and "[e]ach additional use of force was necessitated by Plaintiff's own escalation of the situation by continuing . . . resistance." *Id.* at 1381. "As such, Plaintiff's complaint, considered in light of the video evidence, is not sufficient to show that he suffered a constitutional violation." *Id.*

---

[10] The severity of any injury Hill suffered is also called into question by his immediate resumption of physical resistance when officers attempt to secure him in the van after the hospital, as discussed below.

Defendants Motion describes "Incident 3," as comprised of the attempts of Defendants J. Florio, L. Florio, and Escobedo to secure Hill in a transport van. J. Florio's body-worn camera video shows that officers release the handcuffs securing Hill to the gurney and, once officers attempt to place him into the transport van, he immediately resumes physical resistance. *See* Ex. 1 at 20:48:14. The video shows him brace his feet on a step up to the van and he begins using that leverage to push against the officers attempting to boost him into it. His resistance is so vigorous, that J. Florio's body worn camera is dislodged. *See id.* at 20:48:17. From the camera's vantage point on the ground, the extent and vigor of Hill's resistance to the officers is obvious, until its view is obscured. *See id.* at 20:48:24-20:48:43. After J. Florio's camera is dislodged, the events are captured by Officer Lambert's body-worn camera. *See* Ex. 6, 20:48:43. Both J. Florio and Escobedo clearly instruct Hill to put his foot into the van multiple times, and Hill clearly does not comply and continues to push his legs out of the van. J. Florio can be seen attempting to force Hill's compliance by pushing and scraping his leg with a baton. *See id.* at 20:51:36. Hill neither complies nor indicates that the baton is particularly painful. Finally, Escobedo informs Hill

that, if he does not comply, he will be pepper sprayed and, when Hill continues to refuse, pepper sprays him. *See id.* at 20:51:46. Hill continues to refuse to place his leg in the van. Defendant J. Florio retrieves his body-worn camera after Hill has been pepper sprayed. *See* Ex. 1 at 20:52:38. It is clear that Hill is continuing to push his foot out of the van. As J. Florio attempts to push Hill's leg into the van, Hill extends his other leg. *See id.* at 20:53:08-20:53:16. Hill's kicking, again, dislodges, J. Florio's camera. *See id.* at 20:53:16. The officers are finally able to secure Hill in the van only after securing his legs with handcuffs. *See* Ex. 6 at 20:54:46-20:55:04; *see also* Ex. 7 at 20:53:16-20:55:04. Officer L. Florio's body-worn camera captured the entirety of Hill's transportation to the jail. *See* Ex. 7 at 20:55:04-21:27:45.

As before, the video recordings show that Hill was not subjected to excessive force during "Incident 3." As Defendant's brief explains, Hill's active resistance to being placed into the van justified officers' uses of force. *See* doc. 16 at 13-14. Hill's response to the Defendants' Motion does not address "Incident 3" at all. *See generally* doc. 21. As recounted above, it is clear from the video recordings, that Hill refused to comply with the officers' multiple commands to enter the van and actively and

forcefully resisted multiple attempts to secure his compliance. The officers' use of force only escalated as Hill persisted in his noncompliance and resistance.

As discussed above, some use of force is reasonable in response to a suspect's physical resistance to being placed in a police vehicle, incident to an arrest. *See Lee v. Gee*, 722 at 1380-81. *Cf. Moore v. Danza*, 726 F. Supp. 3d 459, 479-80 (E.D. Cal. 2024) (finding use of a taser to subdue prisoner who was noncompliant and physically resisted placement in a transport vehicle by, among other acts, "using his legs to keep the passenger-side door open," not excessive, albeit under the Eight Amendment); *Lewis v. Jones*, 2024 WL 1345715, at *12 (E.D. Ark. Mar. 29, 2024) (finding use of a taser on suspect who "did not comply [with order to enter a police vehicle] but remained seated with his legs hanging out of the door of the vehicle," was objectively reasonable, under the Fourth Amendment). Moreover, as Defendants point out, striking a resisting suspect's legs in response to such resistance has been acknowledged as reasonable. *See* doc. 16 at 13-14 (citing *Vickers v. Georgia*, 567 F. App'x 744, 747 n. 3 (11th Cir. 2014)). Similarly, use of pepper spray on a physically resisting arrestee or detainee has been

recognized as objectively reasonable. *See, e.g., Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 739 (11th Cir. 2010) ("[T]his Court has noted that the use of pepper spray is not excessive force in situations where the arrestee . . . uses force against officers, [or] physically resists arrest . . . in which cases pepper spray is a permissible way to disable a suspect without causing permanent physical injury," and collecting cases (internal quotation marks and citation omitted)).

In summary, the video recordings of Hill's arrest and transportation to jail on August 8, 2023 establish that the force used against him was objectively reasonable. Hill does not dispute that his initial arrest was lawful. The videos show that Hill fled from Defendant's J. Florio and Escobedo. Once he was subdued, he persistently and physically resisted officers at every opportunity. In each instance, officers verbally requested compliance—sometimes reminding him of the absolute futility of his actions—before any force was deployed. When Hill's intransigence necessitated force, the force deployed was extremely limited. To the extent that it escalated, it escalated proportionally with Hill's behavior. Given that the recordings are admissible and show that each use of force was objectively reasonable, there was no violation of

Hill's constitutional rights.  The lack of a constitutional violation is fatal to Hill's claims, whether considered under the rubric of qualified immunity or on their merits.  Accordingly, Defendant's Motion to Dismiss is **GRANTED**.  Doc. 16.  Hill's Complaint is **DISMISSED**.  The Clerk is **DIRECTED** to **CLOSE** this case.

      **SO ORDERED**, this 31th day of March, 2025.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

30